UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-40632
_____


PETER VEECK, doing business as
Regional Web,

                    Plaintiff/Counter Defendant-Appellant,

          versus

SOUTHERN BUILDING CODE CONGRESS
INTERNATIONAL, INC.,

                    Defendant/Counter Claimant-Appellee.


_____

          Appeals from the United States District Court
               for the Eastern District of Texas
_____

                     June 7, 2002

Before KING, Chief Judge, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH,
WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART,
PARKER, DENNIS and CLEMENT, Circuit Judges.

EDITH H. JONES, Circuit Judge:

          The issue in this en banc case is the extent to which a

private organization may assert copyright protection for its model

codes, after the models have been adopted by a legislative body and

become "the law".  Specifically, may a code-writing organization

prevent a website operator from posting the text of a model code

where the code is identified simply as the building code of a city

that enacted the model code as law?  Our short answer is that as

law, the model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives. As model codes, however, the organization's works retain their protected status.

BACKGROUND[1]

Peter Veeck individually operates "Regional Web" (<http://regionalweb.texoma.net>), a non-commercial website that provides information about north Texas. Sometime in 1997, Veeck decided to post on Regional Web the local building codes of Anna and Savoy, two small towns in north Texas that had adopted the 1994 edition of the Standard Building Code written by appellee, Southern Building Code Congress International, Inc. ("SBCCI"). Veeck made a few attempts to inspect several towns' copies of the Building Code, but he was not able to locate them easily. Eventually, Veeck purchased the 1994 model building codes directly from SBCCI; he paid $72.00 and received a copy of the codes on disk. Although the software licensing agreement and copyright notice indicated that the codes could not be copied and distributed, Veeck cut and pasted their text onto his Regional Web. Veeck's website did not specify that the codes were written by SBCCI. Instead, he identified them, correctly, as the building codes of Anna and Savoy, Texas.

The author of the codes, SBCCI, is a non-profit organization consisting of approximately 14,500 members from government bodies, the construction industry, business and trade

---

[1] The facts stated here are undisputed.

2

associations, students, and colleges and universities. Since 1940, SBCCI's primary mission has been to develop, promote, and promulgate model building codes, such as the Standard Plumbing Code, the Standard Gas Code, the Standard Fire Prevention Code, and the Standard Mechanical Code. SBCCI encourages local government entities to enact its codes into law by reference, without cost to the governmental entity. No licensing agreements are executed in connection with legislative adoption, nor does SBCCI keep track of the entities that have adopted its codes. Although SBCCI is a non-profit organization, its annual budget, exceeding $9 million, derives in part from sales of its model codes and is used to fund continuing activities. There are no restrictions or requirements on membership in SBCCI, but non-members are charged considerably more for copies of its codes than are members.

While SBCCI continues to assert its copyright prerogatives -- exclusively to publish the codes and license their reproduction and distribution -- even as to codes that have been adopted by local entities, the organization insists that it grants liberal permission for copying. To support this contention, SBCCI offered in evidence several dozen letters of permission written to entities as diverse as book publishers, seminar providers, and municipal inspection agencies. Notably, each permit letter carefully circumscribed the amount of copying allowed.

SBCCI's generosity did not extend to Veeck's public-service posting of the Anna and Savoy building codes on his

3

website.  The organization demanded that he cease and desist from infringing its copyrights.  Veeck filed a declaratory judgment action seeking a ruling that he did not violate the Copyright Act.  SBCCI counterclaimed for copyright infringement, unfair competition and breach of contract.  Both parties moved for summary judgment on the copyright infringement issue.

Finding no genuinely disputed material facts, the district court granted summary judgment in favor of SBCCI, including a permanent injunction and monetary damages.  On appeal, a divided panel of this court upheld SBCCI's copyrights in the municipal building codes posted by Veeck, and it rejected his defenses to infringement based on due process, merger, fair use, copyright misuse and waiver.

We elected to rehear this case <u>en banc</u> because of the novelty and importance of the issues it presents.

DISCUSSION[2]

As the organizational author of original works, SBCCI indisputably holds a copyright in its model building codes.  <u>See</u> 17 U.S.C. § 102(a).  Copyright law permits an author exclusively to make or condone derivative works and to regulate the copying and

---

[2] We review the district court's grant of summary judgment <u>de novo</u>. <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998); Fed. R. Civ. P. 56(c).  At the summary judgment stage, a court may not weigh the evidence or evaluate the credibility of witnesses, and all justifiable inferences will be made in the nonmoving party's favor.  <u>Id.</u> (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14 (1986)). The district court drew some inferences from the facts, however, regarding the impact of copyrightability on SBCCI's operations that, if material, should not have been decided without a trial.  We find it unnecessary to reach those issues.

4

distribution of both the original and derivative works. 17 U.S.C. § 106. The question before us is whether Peter Veeck infringed SBCCI's copyright on its model codes when he posted them only as what they became -- building codes of Anna and Savoy, Texas -- on his regional website. Put otherwise, does SBCCI retain the right wholly to exclude others from copying the model codes after and only to the extent to which they are adopted as "the law" of various jurisdictions?

The answer to this narrow issue seems compelled by three sources: the Supreme Court's holding that "the law" is not copyrightable; alternatively, the Copyright Act's exclusion from its scope of "ideas" or "facts"; and the balance of caselaw.

## I.    The Supreme Court's View

Excluding "the law" from the purview of the copyright statutes dates back to this nation's earliest period. In 1834, the Supreme Court interpreted the first federal copyright laws and unanimously held that "no reporter has or can have any copyright in the written opinions delivered by this Court. . ." Wheaton v. Peters, 33 U.S. (8 Pet.) 591, 668 (1834). The case arose when one of the Court's official reporters was asserting copyright protection for his annotated compilations of Supreme Court opinions. The Court distinguished between the reporter's individual work and the Justices' opinions. The Court's rejection of copyright for judicial opinions paralleled the principle -- recognized by attorneys for both parties -- that "[s]tatutes were

5

never copyrighted."[3]  Based on the acknowledged and incontestable analogy with legislative acts, <u>Wheaton</u> held unanimously that "the law" in the form of judicial opinions may not be copyrighted.

The same broad understanding of what constitutes "the law" for copyright purposes underlies the Court's later decision in <u>Banks v. Manchester</u>, 128 U.S. 244, 9 S.Ct. 36 (1888).  The Court there denied a copyright to a court reporter in his printing of the opinions of the Ohio Supreme Court.  The Court first noted that whatever work the judges perform in their official capacity cannot be regarded as authorship under the copyright law.  As a question of "public policy," the Court stated that,

> there has always been a judicial *consensus*,
> from the time of the decision in the case of

---

[3]    See <u>Precis of Argument by Counsel for Wheaton [pet'r]</u>, 33 U.S. (8 Pet.) at 615.  Wheaton acknowledged, even while arguing that judicial opinions could be copyrighted, that "it would be absurd, for a legislature to claim the copyright; and no one else can do it, for they are the authors, and cause them to be published without copyright. . . . Statutes were never copyrighted." <u>Id</u>. Further, "it is the bounden duty of government to promulgate its statutes in print . . ." <u>Id</u>. at 616.

Counsel for Peters, the respondent, emphasized the governing policy that "all countries . . . subject to the sovereignty of the laws" hold the promulgation of the laws, from whatever source, "as essential as their existence." <u>Id</u>. at 618-19.  Peters's brief continues:

> It is, therefore, the true policy, influenced by the
> essential spirit of the government, that laws of every
> description should be universally diffused.  To fetter
> or restrain their dissemination, must be to counteract
> this policy; to limit, or even to regulate it, would, in
> fact, produce the same effect.
>
> . . .
>
> If either statutes or decisions could be made private
> property, it would be in the power of an individual to
> shut out the light by which we guide our actions.

<u>Id</u>. at 620.

6

> *Wheaton v. Peters*, 8 Pet. 591, that no
> copyright could, under the statutes passed by
> Congress, be secured in the products of the
> labor done by judicial officers in the
> discharge of their judicial duties. <u>The whole
> work done by the judges constitutes the
> authentic exposition and interpretation of the
> law, which, binding every citizen, is free for
> publication to all, whether it is a
> declaration of unwritten law, or an
> interpretation of a constitution or statute.</u>

*Banks*, 128 U.S. at 253, 9 S.Ct. at 40. (emphasis added). At this point, *Banks* relied upon a decision of the Massachusetts Supreme Judicial Court, which stated,

> [I]t needs no argument to show that justice
> requires that all should have free access to
> the opinions, and that it is against sound
> public policy to prevent this, or to suppress
> and keep from the earliest knowledge of the
> public the statutes, or the decisions and
> opinions of the Justices.

*Nash v. Lathrop*, 142 Mass. 29, 6 N.E. 559 (1886). The court in *Nash* further observed that a legislature likewise could not deny public access to statutes.

*Banks* represents a continuous understanding that "the law," whether articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus not amenable to

7

copyright.[4]  Modern decisions have followed suit.[5]  Significantly, the 1976 Copyright Act specifically denies protection to federal statutes and regulations.  17 U.S.C. § 105.  Given the state law foundation of <u>Banks</u> and its progeny, there is no reason to believe that state or local laws are copyrightable.  <u>See generally</u> L. Ray Patterson & Craig Joyce, <u>Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations</u>, 36 U.C.L.A. L. REV. 719, 751-58 (1989); 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 5.06 [c] at 5-92 (2000) ("state statutes, no less than federal statutes, are regarded as being in the public domain"); 1 PATRY, COPYRIGHT LAW AND PRACTICE 351, 357 (1994).

As governing law, pursuant to <u>Banks</u>, the building codes of Anna and Savoy, Texas cannot be copyrighted.

SBCCI and its numerous amici[6] must limit or circumvent the <u>Banks</u> line of cases in order to prevail.  Initially, SBCCI

---

[4]    In <u>Davidson v. Wheelock</u>, for example, the court stated that a compiler of state statutes "could obtain no copyright for the publication of the laws only; neither could the legislature confer any such exclusive privilege upon him." <u>Davidson v. Wheelock</u>, 27 F. 61, 62 (D.Minn. 1886).  More famously, Justice Harlan, riding circuit, denied an injunction sought for the compiler of Michigan statutes, holding that "no one can obtain the exclusive right to publish the laws of the state in a book prepared by him."  <u>Howell v. Miller</u>, 91 F. 129, 137 (6th Cir. 1898).

[5]    <u>Harrison Co. v. Code Revision Commission</u>, 260 S.E.2d 30, 34 (Ga. 1979); <u>State of Ga. v. The Harrison Co.</u>, 548 F.Supp. 110, 114-15 (N.D. Ga. 1982), <u>vacated per stipulation</u>, 559 F.Supp. 37 (N.D. Ga. 1983).

[6]    The amici supporting SBCCI's position include Building Officials and Code Administrators International (BOCA), International Code Council, International Conference of Building Officials, American Medical Association, American National Standards Institute (ANSI), American Society of Association Executives (ASAE), American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE), American Society of Mechanical Engineers (ASME), National Fire Protection Association (NFPA), Texas Municipal League, and Underwriters Laboratories, Inc. (UL).

divides <u>Banks</u> into two holdings and concludes that either holding must be squared with the policies and purposes of copyright law. This not insubstantial mode of analysis must be carefully reviewed.

The first holding of <u>Banks</u> is said to deny copyright to judicial opinions because judges, whose salaries are paid by the government, cannot claim to be "authors" of their official works. SBCCI contends that this discussion shows only that judges have no need of the Copyright Act's economic incentives in order to author judicial opinions. <u>Banks</u>, it is implied, articulates a utilitarian rationale for denying copyright protection to judicial opinions. SBCCI contrasts government employees with the private "authors" of model codes who allegedly depend on copyright incentives in order to perform their public service. SBCCI concludes that this "prong" of <u>Banks</u> does not apply to private code-writing organizations whose work has been adopted or incorporated into statutes, ordinances, or government regulations. Two courts, in addition to the panel that originally heard this case, have identified the consideration of authorship incentives as a "holding" of <u>Banks</u>. <u>See</u> <u>Practice Management Info. Corp. v. American Medical Ass'n</u>, 121 F.3d 516, 518 (9th Cir. 1997), <u>opinion</u> <u>amended</u> <u>by</u> 133 F.3d 1140 (9th Cir. 1998);[7] <u>County of Suffolk v. First American Real Estate Solutions</u>, 261 F.3d 179, 194 (2d Cir. 2001).

---

[7] <u>Practice Management</u> declares, "The copyright system's goal of promoting the arts and sciences by granting temporary monopolies to copyrightholders was not at stake in <u>Banks</u> because judges' salaries provided adequate incentive to write opinions." <u>Id</u>.

9

The second "holding" of <u>Banks</u>, which requires "the law" or its exposition to be "free for publication to all," is recharacterized by SBCCI as a "due process" argument. That argument devolves into a factual question concerning public "access" to the law. Because SBCCI contends that there is no dispute about the adequacy of public "access" to its model codes, after their enactment as the building codes of Anna and Savoy, <u>Banks</u> is inapplicable.

The "dual holding" analysis seems to foist on <u>Banks</u> a rationale that the Supreme Court never explicitly articulated. <u>Banks</u>, however, does not bifurcate its holding based on the particular authors' need of the Copyright Act's incentives or a factual calculus concerning the "adequacy" of public access to the law. Instead, <u>Banks</u> declares at the outset of its discussion that copyright law in the United States is purely a matter of statutory construction. <u>See</u> <u>Banks</u>, 128 U.S. at 251, 9 S.Ct. at 39. In the next paragraph, the Court points out that the court reporter was not the statutory "author" of the judicial decisions. Then, the Court states that

> In no proper sense can the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case, and the syllabus, or head-note, be regarded as their author or their proprietor, in the sense of [the copyright statute] . . .
>
> Judges, as is well understood, receive from the public treasury a stated annual salary, fixed by law, and can themselves have no pecuniary interest or proprietorship, as

10

against the public at large, in the fruits of
their judicial labors.

128 U.S. at 253, 9 S.Ct. at 40. The Court then broadly defines the

judges' official work and states that as a matter of public policy

and judicial consensus, "no copyright could, under the statutes

passed by Congress, be secured in the products of the labor done by

judicial officers in the discharge of their official duties." This

paragraph of Banks climaxes with the explanation:

> The whole work done by the judges constitutes
> the authentic exposition and interpretation of
> the law, which, binding every citizen, is free
> for publication to all, whether it is a
> declaration of unwritten law, or an
> interpretation of a constitution or statute.
> Id. at 253-54 [citing Nash v. Lathrop].

There is simply no independent holding in Banks that

judges are not "authors" under the copyright law because, as public

officials, they do not need the "incentives" that copyright law

affords in order to write opinions. Instead, Banks refers to the

source of the judges' salary in order to explain that it is the

public at large, not the judges, who have the "pecuniary interest

or proprietorship" in "the fruits of their judicial labors." The

whole of those judicial labors, as Banks immediately defines them,

"constitutes the authentic exposition and interpretation of the

law," which is "free for publication to all . . . ." Id.[8]

---

[8]     If there were an independent holding in Banks relying on the fact
that judges are paid by the public, it was rejected by the Court itself one month
later, when the Court ruled that a court reporter, notwithstanding that he was
a state employee, could assert copyright in all of his compilation of judicial
opinions except the opinions themselves. Callaghan v. Myers, 128 U.S. 645, 9
S.Ct. 617 (1888).

11

Moreover, when viewed in light of <u>Wheaton</u>, the last case relied on by <u>Banks</u>'s analysis, the argument for bifurcation is seriously weakened. <u>Wheaton</u>'s holding, as has been shown, derives from an analogy between judicial opinions and legislative acts as together constituting "the law," which is not subject to copyright.

The origin of the bifurcated holding interpretation of <u>Banks</u> seems to lie in the First Circuit's thoughtful opinion in <u>Building Officials and Code Adm. v. Code Technology, Inc.</u>, 628 F.2d 730 (1st Cir. 1980), but the First Circuit does not endorse bifurcation. In this opinion, which will be discussed further infra, the First Circuit considered the argument of BOCA, the model code writer, urging copyright protection for a model building code similar in origin and purpose to the one before us. BOCA's argument, the court said, "implies that the rule of <u>Wheaton v. Peters</u> was based on the public's property interest in work produced by legislators and judges, who are, of course, government employees." <u>BOCA</u>, 628 F.2d at 734.

While acknowledging that this interpretation is "not without foundation," the First Circuit cautioned: "But <u>BOCA</u>'s argument overlooks another aspect of the ownership theory discussed in these cases." <u>Id</u>. <u>BOCA</u> then identifies the real premises of <u>Banks</u> and related cases: the "metaphorical concept of citizen authorship" of the law, together with "the very important and practical policy that citizens must have free access to the laws which govern them." <u>Id</u>. <u>BOCA</u> cited the authorship rationale for

12

Banks only to find it unsatisfactory.  In our view, BOCA was correct.

Only by bifurcating Banks can SBCCI achieve its purpose of claiming authorship of "the law" and proprietary rights in its codes that have been enacted into law.  However, the acceptance of SBCCI's and the dissent's theory, that non-governmental employees who draft model statutes or regulations may be entitled to copyright protection, raises troubling issues. The complexities of modern life and the breadth of problems addressed by government entities necessitate continuous participation by private experts and interest groups in all aspects of statutory and regulatory lawmaking.  According to SBCCI, a utilitarian test should be invoked to determine which organizations "need" the incentives provided by the Copyright Act in order to perform the public service of drafting specialized statutes, ordinances or regulations.  Alternatively, perhaps SBCCI and the dissent intend that whenever any private "author" finds his or her proposal adopted verbatim in law, copyright protection may be claimed.[9]  As an example, three law professors have taken credit for drafting a recent federal statute on supplemental federal court jurisdiction.  See 28 U.S.C. § 1367; Christopher M. Fairman, Abdication to

---

[9]    One of SBCCI's amici argues that this is an unrealistic threat, since, inter alia, the run-of-the-mill lobbyist or good citizen involved in the legislative process does not assert a copyright.  That these "authors" may be more generous, or less sophisticated, than the large and well-funded code-writing organizations before us hardly furnishes a reason to approve an open-ended test of authorship of the law.

13

<u>Academia: The Case of the Supplemental Jurisdiction Statute, 28 U.S.C. § 1367</u>, 19 SETON HALL LEGIS. J. 157 (1994). Under SBCCI's reasoning, it is likely that these professors, had they so desired, could have asserted a copyright in their "model supplemental jurisdictional provision."[10] SBCCI offers no outer limit on claims of copyright prerogatives by nongovernmental persons who contribute to writing "the law."

Not only is the question of authorship of "the law" exceedingly complicated by SBCCI's and the dissent's position, but in the end, the "authorship" question ignores the democratic process. Lawmaking bodies in this country enact rules and regulations only with the consent of the governed. The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities. Even when a governmental body consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of "the law." In performing their function, the lawmakers represent the public will, and the public are the final "authors" of the law.

The <u>BOCA</u> decision put it thus:

> The citizens are the authors of the law, and
> therefore its owners, regardless of who

---

[10] We are not stating or holding that the authorship of government works never presents a legitimate issue of copyright. On the contrary, the Copyright Act carefully defines the extent to which federal government employees and contractors can obtain copyright protection. But these provisions have never been held to supersede <u>Banks</u>'s holding that "the law" is in the public domain.

14

> actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process.

628 F.2d at 734.[11]  This "metaphorical concept of citizen authorship" together with the need for citizens to have free access to the laws are the ultimate holding of <u>Banks</u>.  <u>Id</u>.

BOCA described free access as a policy "based on the concept of due process," the people's right to know what the law requires so that they may obey it and avoid its sanctions.  SBCCI and the dissent contend that this "due process" reasoning involves nothing more than the factual issue of "sufficient" public access to the building codes of Anna and Savoy.  Since a copy of the codes is available for inspection and individual copying in a public office, SBCCI contends that the obligations of due process are fulfilled.

We disagree that the question of public access can be limited to the minimum availability that SBCCI would permit.  <u>Banks</u> does not use the term "due process."  There is also no suggestion that the <u>Banks</u> concept of free access to the law is a factual determination or is limited to due process, as the term is understood today.  Instead, public ownership of the law means precisely that "the law" is in the "public domain" for whatever use

---

[11]    Technically, citizen "ownership" of the law might suggest that local governmental entities, as public representatives, could prevent copying of the law.  As Goldstein notes, the decisions holding that statutes are in the public domain prevent any such misunderstanding.  1 GOLDSTEIN, COPYRIGHT, § 2.48 at n.42.

the citizens choose to make of it. Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse. If a citizen wanted to place an advertisement in a newspaper quoting the Anna, Texas building code in order to indicate his dissatisfaction with its complexities, it would seem that he could do so. In our view, to say, as Banks does, that the law is "free for publication to all" is to expand, not factually limit, the extent of its availability.

Moreover, as the BOCA decision observed, it is difficult to reconcile the public's right to know the law with the statutory right of a copyright holder to exclude his work from any publication or dissemination. SBCCI responds that due process must be balanced against its proprietary rights and that the fair use doctrine as well as its honorable intentions will prevent abuse. Free availability of the law, by this logic, has degenerated into availability as long as SBCCI chooses not to file suit.[12]

For these reasons, we reject SBCCI's deconstruction of Banks into merely utilitarian and factual issues. Instead, we read Banks, Wheaton, and related cases consistently to enunciate the principle that "the law," whether it has its source in judicial

---

[12] SBCCI does not permit governmental entities to publish its model codes when they are enacted. Instead, it permits their adoption by reference and furnishes a copy of the adopted code to the entity. SBCCI also generously allows that if a governmental entity were to publish the building code on an Internet site to meet its due process obligation, that would be a fair use. But when the North Carolina Building Officials were permitted to publish a model code on their non-public access website, SBCCI expressly reserved its rights.

opinions or statutes, ordinances or regulations, is not subject to federal copyright law.[13]

To sum up this section, we hold that when Veeck copied only "the law" of Anna and Savoy, Texas, which he obtained from SBCCI's publication, and when he reprinted only "the law" of those municipalities, he did not infringe SBCCI's copyrights in its model building codes. The basic proposition was stated by Justice Harlan, writing for the Sixth Circuit: "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book . . ." Howell v. Miller, 91 F. 129, 137 (6th Cir. 1898).[14] See Jerry E. Smith, Government Documents: Their Copyright and Ownership, 22 Copyright Symposium 147, 174 (ASCAP 1977), reprinted in 5 TEX. TECH L. REV. 71, 92 (1973).

## II.  The Copyright Act

### A.  The Merger Doctrine

As we earlier stated, SBCCI is the "author" of model building codes that, qua model building codes, are facially copyright-protected. This is true even if Banks places the building codes of Anna and Savoy, and other governmental entities

---

[13]  What constitutes "the law" when a governmental entity adopts or incorporates by reference an author's copyrightable work will be considered infra, Part III.

[14]  Our decision might well be the opposite, if Veeck had copied the model codes as model codes, or if he had indiscriminately mingled those portions of "the law" of Anna and Savoy adopted by their town councils with other parts of the model codes not so adopted.

that adopted part or all of SBCCI's model codes, in the public domain. But if the holding of <u>Banks</u> fails, Veeck alternatively asserts a defense under the Copyright Act to the protection of the model codes after they have been enacted into positive law. Once adopted, he asserts, the model codes become "facts" that are not protected under the Copyright Act. Further, because there is only one way to express the meaning of the building codes, the "idea" embodied in the law merges with SBCCI's expression, and at that point, renders copyright protection unavailable.

It is not the sole purpose of copyright law to secure a fair return for an author's creative labor. Under the Constitution,

> The primary objective of copyright is not to reward the labor of authors but '[to] promote the Progress of Science and the useful Arts.'" Article I, Sec. 8, clause 8 [U.S. Constitution]. To this end, copyright law assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorships.

<u>Feist Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 349, 111 S.Ct. 1282, 1289-90 (1991). The statute excludes from copyright protection ideas, procedures, processes, systems methods of operation, or information in the public domain. <u>See</u> 17 U.S.C. § 102(b); <u>Feist Publications</u>, 499 U.S. at 350, 111 S.Ct. at 1290 (citation omitted); <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547-48, 105 S.Ct. 2218, 2223 (1985). If an

18

idea is susceptible to only one form of expression, the merger doctrine applies and § 102(b) excludes the expression from the Copyright Act. As the Supreme Court has explained it, this "idea/expression dichotomy strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." Harper & Row, 471 U.S. at 556, 105 S.Ct. at 2228.

Veeck copied the building code of the towns of Anna and Savoy, Texas, based on their adoption of a version of the SBCCI model code. The codes are "facts" under copyright law. They are the unique, unalterable expression of the "idea" that constitutes local law. Courts routinely emphasize the significance of the precise wording of laws presented for interpretation. See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."). Judge Little, dissenting from the panel opinion in this case, observed that

> . . . the merger doctrine is especially appropriate because other methods of expressing the idea are foreclosed. [citation omitted] An individual wishing to publish the text of a law cannot develop his own, unique version and still publish an authoritative copy.

Veeck v. Southern Bldg. Code Cong. Int'l, 241 F.3d 398, 416 (5th Cir. 2001) (Little, J., dissenting). It should be obvious that for copyright purposes, laws are "facts": the U.S. Constitution is a

19

fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less "facts" than the products of more August legislative or regulatory bodies. While the Supreme Court has not stated directly that laws are "facts," it has broadly observed that, as with census data, "the same is true of all facts -- scientific, historical, biographical and news of the day. 'They may not be copyrighted and are part of the public domain available to every person.'" Feist, 499 U.S. at 348, 111 S.Ct. at 1289.

Emphasizing not the language of § 102(b), but the "policy" of the merger doctrine, SBCCI contends that merger poses no bar to copyright protection here. The idea/expression dichotomy was enacted into law by Congress to "balance [] the competing concerns of providing incentive to authors to create and foster[] competition in such creativity." Kern River Gas Transmission Co. v. The Coastal Corp., 899 F.2d 1458, 1463 (5th Cir. 1990).[15] Veeck's merger argument ignores the goal of fostering competition in creativity. SBCCI thus asserts that "merger would only apply in this case if a subsequent author seeking to create a building code for Anna or Savoy would have to use the same expression to convey the idea." SBCCI supplemental en banc brief at 7. This argument effectively converts the merger doctrine from a limit on

---

[15] See id. at 1460 (proposed route for a pipeline approved by the Federal Energy Regulatory Commission was an uncopyrightable "idea.")

20

copyrightability into a mere defense against infringement based on the identity of the author. In our view § 102(b) does foster the creativity that SBCCI applauds, but it does so by permitting the free flow of information in facts and ideas from their emergence, rather than as a defense to infringement claims. See Kern River at 1460; Mason v. Montgomery Data, Inc., 967 F.2d 135, 138 n.5 (5th Cir. 1992) ("Mason argues that application of the merger doctrine does not render a work uncopyrightable, but rather prevents a finding of infringement of an otherwise copyrightable work. But this court has applied the merger doctrine to the question of copyrightability.").

SBCCI and the dissent next urge the inapplicability of the merger doctrine because there are many possible ways to express model codes: both the multiplicity of building standards and the variety of ways to express those standards compel the conclusion that the ideas have not merged with their expression. Cf. Mason, 967 F.2d at 139 (rejecting merger because the idea embodied in the author's maps can be expressed in a variety of ways). What SBCCI and the dissent ignore, however, is the graphic merger of its model building codes with "the law" as enacted by Anna and Savoy, Texas. Veeck copied from SBCCI's model codes, 1994 edition, because those codes were transformed into the "fact" and "idea" of the towns' building codes. Veeck could not express the enacted law in any other way.

21

The final argument deployed by SBCCI and the dissent casts the merger doctrine as an inherent balancing test in which courts must reconcile the policies underlying the Copyright Act with the public interest in the free flow of information and ideas. Compare CCC Info Serv. Inc. v. McLean Hunter Market Reports, Inc., 44 F.3d 61, 68 (2nd Cir. 1994) (interpreting Second Circuit's balancing test). It is true that where the line is unclear between expression and facts, procedures, processes, methods of operation, or information in the public domain, a court considering the applicability of § 102(b) must recur to the statute's underlying policy. See, e.g., Feist, 499 U.S. at 361-64, 111 S.Ct. at 1295-97 (determining copyrightability of compilations of facts); Mason, 967 F.2d at 139 (copyrightability of expression in maps). This case, however, is not close. The building codes of Anna and Savoy, Texas can be expressed in only one way; they are facts. Veeck placed those facts on his website in precisely the form in which they were adopted by the municipalities.[16] When the § 102(b) dichotomy is clear, judges are not permitted to substitute policy choices for the legislature's determination.

We emphasize that in continuing to write and publish model building codes, SBCCI is creating copyrightable works of authorship. When those codes are enacted into law, however, they

---

[16]    For the first time, in this court, SBCCI alleges that Veeck did not exactly copy the ordinances, because in the course of their adoption, the towns rejected certain parts of the SBCCI model codes. There is no evidence in the district court record to sustain this contention.

22

become to that extent "the law" of the governmental entities and may be reproduced or distributed as "the law" of those jurisdictions.

B.    Other Provisions[17]

SBCCI's amici make much of provisions of the Copyright Act that, they contend, should protect SBCCI's copyrights from "appropriation" by local government entities.  Section 105 of the Act, taken together with the definition of "works of the government," denies copyright protection to official works of the United States Government, while reserving the possibility that government employees and contractors may obtain, or transfer to the government, copyrights for non-official works.  17 U.S.C. §§ 105, 101.  On its face, these provisions say nothing about the relationship between non-federal government entities and copyright holders.  Moreover, they have never been held inconsistent with Banks or with the merger doctrine.

Section 201(e) of the Act reflects Congress's intention to protect copyrights from involuntary appropriation by government entities.  17 U.S.C. § 201(e).  This is not, however, a "takings" case, not least because SBCCI urged localities to adopt its model codes.  The issue in the case is not the voluntariness of the

---

[17]    Veeck also raised infringement defenses based on his fair use of the model codes or SBCCI's waiver of its copyrights.  It is unnecessary to reach these issues.

23

appropriation but the legal consequences flowing from the permission that SBCCI gave.

### III. The Caselaw; Model Codes Versus Standards

Until recently in our history, it was understood that Wheaton, Banks and nearly every other pertinent case held that copyright protection may not be asserted for the text of "the law".[18] The basic proposition was stated by Justice Harlan, writing for the Sixth Circuit: "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book . . ." Howell v. Miller, 91 F. 129, 137 (6th Cir. 1898).

As of 1980, the noncopyrightability of "the law" appeared settled to the First Circuit in BOCA. The court focused on the real holding of Banks and accordingly vacated preliminary injunctive relief to the author of a building code adopted into law by the Commonwealth of Massachusetts.[19] The court held that BOCA had failed to carry its burden of distinguishing, for preliminary relief purposes, the Massachusetts building code from non-copyrightable statutes and judicial opinions. But the court then remanded the case for further development in light of the novelty

---

[18]   See also Texas v. West Publishing Co., 882 F.2d 171, 174, 177 (5th Cir. 1989), in which the State of Texas sought a declaratory judgment that West's copyright in their original arrangement of annotated Texas statutes was invalid. This court rejected the state's argument and observed in passing that West did not claim a copyright in the text of the statutes themselves or in any of the readily-available public compilations of statutes.

[19]   BOCA is an amicus curiae in this case supporting SBCCI's position.

24

of the issue, the insufficiency of the trial court record, and the apparent trend toward adoption of model codes by governmental entities. The court nevertheless was skeptical that BOCA would prevail, commenting

> it is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder . . .

BOCA, 628 F.2d at 730. Though not a definitive holding, BOCA clearly favors Veeck's position over that of SBCCI, and it is most closely on point.

The record has been developed in this case and, with the perspective gained from other recent caselaw and from the multiple submissions to the court, we have no hesitation in confirming BOCA's predisposition against the copyrightability of model codes to the extent they have been adopted as law. But the limits of this holding must be explained. Several national standards-writing organizations joined SBCCI as amici out of fear that their copyrights may be vitiated simply by the common practice of governmental entities' incorporating their standards in laws and regulations.[20] This case does not involve references to extrinsic standards. Instead, it concerns the wholesale adoption of a model

---

[20] See 63 Fed.Reg. 8545, 8554-55 (Feb. 19, 1998) (Office of Management and Budget Notice of Final Revision of Circular A-119) (directing federal agencies to adopt privately developed standards "whenever practicable and appropriate" to "eliminate[ ] the cost to the Government of developing its own standards").

code promoted by its author, SBCCI, precisely for use as legislation. Caselaw that derives from official incorporation of extrinsic standards is distinguishable in reasoning and result. See CCC Info. Services v. Maclean Hunter Market Reports, Inc., 44 F.3d 61 (2nd Cir. 1994); and Practice Management Info. Corp. v. American Medical Ass'n, 121 F.3d 516 (9th Cir. 1997), opinion amended by 133 F.3d 1140 (9th Cir. 1998).

In CCC Information Services, a New York statute required insurance companies to use the "Red Book," a privately prepared and copyrighted list of projected automobile values, as one of several standards in calculating the payments upon the total loss of a vehicle. CCC Information Services systematically loaded portions of the Red Book onto its computer network and distributed the information to its customers. One of CCC's theories was that the Red Book had entered the public domain. The Second Circuit addressed the public domain issue briefly, stating that "we are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright." CCC Info. Services, 44 F.3d at 74. CCC notes the infringer's reliance on the BOCA decision, but it does not opine on that case, confining itself to the precise facts before the court.

Practice Management involved the American Medical Association's copyrighted coding system for reporting physicians' services and medical procedures. The Federal Health Care Financing Administration (HCFA) contacted and then agreed with AMA to use the

26

AMA's coding system for identifying physicians' services on Medicare and Medicaid reimbursement forms. AMA granted a "non-exclusive, royalty-free and irrevocable" license to HCFA, without restrictions on the government's ability to reproduce or distribute AMA's codes. There was no evidence that AMA had restricted the code's availability to anyone. The Ninth Circuit held that the HCFA's decision to adopt regulations requiring physicians to use a version of the AMA code on Medicaid claim forms did not place the code in the public domain under Banks. Practice Management, 121 F.3d at 519 ("[T]he AMA's right under the Copyright Act to limit or forgo publication of the [coding system] poses no realistic threat to public access.").

Both the Second and Ninth Circuits feared that reaching the opposite conclusion in those cases would have "expose[d] copyrights on a wide range of privately authored model codes, standards, and reference works to invalidation." Practice Management, 121 F.3d at 519. The Ninth Circuit suggested that federal court rules regarding citations could invalidate the copyrightability of the Blue Book. Id. at n.5. The Second Circuit feared that a ruling in favor of CCC Information Systems would call into question the copyrightability of school books once they were assigned as part of a mandatory school curriculum. CCC Info Services, 44 F.3d at 74.

These decisions, and the hypothetical situations they discuss, are all distinguishable from Veeck. If a statute refers

27

to the Red Book or to specific school books, the law requires citizens to consult or use a copyrighted work in the process of fulfilling their obligations. The copyrighted works do not "become law" merely because a statute refers to them. See 1 GOLDSTEIN COPYRIGHT, § 2.49 at n. 45.2 ( noting that CCC and Practice Management "involved compilations of data that had received governmental approval, not content that had been enacted into positive law"). Equally important, the referenced works or standards in CCC and Practice Management were created by private groups for reasons other than incorporation into law. To the extent incentives are relevant to the existence of copyright protection, the authors in these cases deserve incentives. And neither CCC nor AMA solicited incorporation of their standards by legislators or regulators. In the case of a model code, on the other hand, the text of the model serves no other purpose than to become law. SBCCI operates with the sole motive and purpose of creating codes that will become obligatory in law.

At first glance, Practice Management appears to pose a closer issue because the HCFA did not simply refer physicians to the AMA's coding system. The court's opinion directs the reader to HHS's notice in the Federal Register announcing that HCFA would require physicians to

> use exclusively a common procedure coding
> system. The system is the HCFA common
> procedure coding system (HCPCS). This coding
> system is to be used for coding procedures
> that have been performed . . . and is

28

> basically used for determining reimbursement amounts.  HCFA developed the HCPCS in 1979 and 1980 by using the AMA's CPT-4 [the copyrighted coding system] for physician services and adding HCFA-developed codes for some non-physician services.  In addition, we developed conversion techniques to prevent unwarranted payment escalation.

50 Fed. Reg. 40895, 40897.  To be precise, then, HCFA had its own coding system (the HCPCS) that incorporated AMA's code but also included additional information.

But unlike Veeck, Practice Management Information Corporation, a commercial publisher of medical textbooks, was <u>not</u> trying to publish its own version of the HCPCS.  Practice Management desired to sell a cheaper edition of the AMA's code, which was also used by insurance companies and had other non-governmental uses.  It is not clear how the Ninth Circuit would have decided the case if Practice Management had published a copy of the HCPCS.  By analogy, the result in this case would have been different if Veeck had published not the building codes of Anna and Savoy, Texas, but the SBCCI model codes, as model codes.

## IV.  Policy Arguments

Many of SBCCI's and the dissent's arguments center on the plea that without full copyright protection for model codes, despite their enactment as the law in hundreds or thousands of jurisdictions, SBCCI will lack the revenue to continue its public

29

service of code drafting.  Thus SBCCI needs copyright's economic incentives.[21]

Several responses exist to this contention.  First, SBCCI, like other code-writing organizations, has survived and grown over 60 years, yet no court has previously awarded copyright protection for the copying of an enacted building code under circumstances like these.  Second, the success of voluntary code-writing groups is attributable to the technological complexity of modern life, which impels government entities to standardize their regulations.  The entities would have to promulgate standards even if SBCCI did not exist, but the most fruitful approach for the public entities and the potentially regulated industries lies in mutual cooperation.  The self-interest of the builders, engineers, designers and other relevant tradesmen should also not be overlooked in the calculus promoting uniform codes.  As one commentator explained,

> . . . it is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less.  Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them.

---

[21]    SBCCI's factual "evidence" on this point consisted of self-serving affidavits from its officers and employees, and proof that it earns perhaps 40% of its revenue from sales of the domestic model codes and amendments.  No effort was made to show by what amount copying by people like Veeck would or could reduce the organization's revenue.

1 Goldstein § 2.5.2, at 2:51.[22]

Third, to enhance the market value of its model codes, SBCCI could easily publish them as do the compilers of statutes and judicial opinions, with "value-added" in the form of commentary, questions and answers, lists of adopting jurisdictions and other information valuable to a reader. The organization could also charge fees for the massive amount of interpretive information about the codes that it doles out. In short, we are unpersuaded that the removal of copyright protection from model codes only when and to the extent they are enacted into law disserves "the Progress of Science and useful Arts." U.S. Const. art. I. § 8, cl. 8.

## Conclusion

For the reasons discussed above, we **REVERSE** the district court's judgment against Peter Veeck, and **REMAND** with instructions to dismiss SBCCI's claims.

---

[22] This court's opinion does not, of course, withdraw all copyright protection from the model codes qua model codes.

PATRICK E. HIGGINBOTHAM, Circuit Judge, joined by KING, Chief Judge, DAVIS and STEWART, Circuit Judges, dissenting:

In this difficult case I am persuaded to join the view that would affirm the judgment of the district court. It is undisputed that Veeck copied the copyrighted product of SBCCI. That parts of the copied material contain the same expressions as the adopted codes of two Texas cities is no defense unless the use by the cities of the protected expression somehow invalidated SBCCI's copyright.

The cities could have hired counsel and engineers to draft a code, recouping its expense either from all taxpayers or by charging a fee to users for a copy of its ordinance. A city could also decide, on behalf of the citizens, to license a finished and copyrighted work. Either is a decision by elected representatives.

Against a refrain that "the law" belongs to the people, Veeck asked us to conclude, as a matter of federal common law, that the choice made by the voters of this municipality was not available to it. Its utility as a decisional norm aside, the refrain passes by the fact that it was legislators who chose what they thought was the most practical path, to adopt a technical code developed at the expense of others under a licensing agreement.

Nothing suggests that private entities will control access to "the law." A contrary vision persists while ignoring the assured access of persons interested in the language of the ordinance. We are not told what impediment a person interested in the ordinance will face that will not be avoided by the doctrines of fair use and implied license or the constitutionally footed right of persons to access the law. Nor does developed case law tell us.

*Banks* holds that judges, as public employees, cannot have a financial interest in the fruits of their judicial labors. It is a case about authorship, about the acquiring of copyrights by public officials, not a case invalidating the copyrights held by private actors when their work is licensed by lawmakers.

As for the merger doctrine, I am not persuaded that it brings anything more to the table. That doctrine reflects the narrow circumstance where an idea can be expressed only one way and hence protection of its expression gives way. A complex code, even a simple one, can be expressed in a variety of ways. That reality is not ended by choosing one manner of expression to enact and then pronouncing that this normative rule—"the law"—can only be expressed in one way. Of course, you have adopted the protected expression; the reasoning is wholly tautological. It is a restatement of the conclusion that adopting the codes invalidated the copyright, not an independent reason why that is so.

33

There is a strong argument for that conclusion and it can be simply stated without calling on the illusion of the merger doctrine: the thinness of the protection enjoyed by this specie of copyright is overcome by the stronger public policy of unfettered access to enacted law, a victory expressed in the conclusion that enacting the code into law put the expression in the public domain. Whether that is so is our question and the merger doctrine does not answer it. Rather we are pushed to decide this case by reconciling two competing policies, expressed at a high level of generality, not unlike the large-scale balancing characteristic of judicial findings of violations of substantive due process. Doing so lacks the accretive marks of case-by-case adjudication, vital to the discipline of judges wearing their "common law" hats. Perhaps we will reach that point in the seriatim course of deciding the cases. If and when we do, the choices will come with more sharply defined features than the abstraction we now have.

Significantly the absence of easily-found answers to the large, broadly-stated policy choices calls for caution. As I earlier observed, these small cities were empowered by the work of SBCCI; they gained the benefit of uniformity in regulation with other cities in their codes as well as proven quality—with the ability to charge a small fee for copies. Any person wishing a copy of the code can obtain it. They can reproduce it for critical commentary or to express their displeasure with its content, even make copies to circulate in a campaign urging that it be rescinded.

34

It bears emphasis that the Congress is best suited to accommodate its Congressionally-created copyright protection with the extraordinary changes in communication trailing the development of the internet. Unless of course it is contended that some Constitutional principle denies Congress the power to authorize copyright protection for governmental entities wishing to adopt codes such as those before us today. And of course the state legislatures and the municipalities are differently situated in another relevant and vital way—the state enjoys an immunity that the municipalities do not. It is ironical that the federal courts are asked to accept a broadly stated principle that would regulate the states by decreeing that some federal principle denies them the choice of accepting or rejecting a license when absent its waiver of immunity the federal copyright regime is not enforceable against them. This unexplored territory offers a confusing backdrop and also counsels caution.

Another confusion must be put aside. When Veeck did his work, the code was already available on the internet, albeit subject to the terms of its license. Veeck's effort was to put the code on the internet free of license. To accept Veeck's contention would invalidate the copyright on every model code except those in inventory that had never been adopted by any governmental body. Publishing adopted model codes as a set with the list of governmental bodies adopting them could be accomplished without honoring the copyright because there would be no copyright.

35

In sum, the suggestion that SBCCI's position asks this Court to extend the reach of the copyright law is exactly backwards. The copyrights at issue here were concededly valid before the cities adopted them as codes. The proper question is whether we should invalidate an otherwise valid copyright as well as the solemn contract between the governmental body and SBCCI. That aggressive contention must find stronger legs than the rhetoric it comes clothed in here. The contention comes with no constitutional or statutory text, except its reliance upon the merger doctrine, and that is wordplay. This is federal common law adjudication. Its hallmark must be case-by-case accretion and measured decision making, even if the case-by-case explanation of the permissible restraint upon the copying of an enacted code leads to the conclusion that Veeck urges today—and I am not yet willing to embrace—that invalidity of the copyright is the inevitable consequence of code adoption. Rather, I conclude that Veeck violated the explicit terms of the license he agreed to when he copied model codes for the internet and posted them. I decide no more.

WIENER, Circuit Judge, joined by KING, Chief Judge, and HIGGINBOTHAM, DAVIS, STEWART, and DENNIS, Circuit Judges, dissenting:

Technical codes and standards have become necessary, pervasive, and indispensable ingredients of Twenty-First Century life in this country; regrettably, today's majority opinion has a real potential of drastically changing the societal landscape through that opinion's predictably deleterious effects on these codes and standards, their authors, and the public and private entities that daily use and depend on them. Despite efforts to clothe its ruling in classic copyright lingo — "public domain," "fact/expression," "merger" — in holding for Veeck under the discrete facts of this case, the majority had to (and did) adopt a per se rule that a single municipality's enactment of a copyrighted model code into law by reference strips the work of all copyright protection, ipso facto. Firmly believing that for this court to be the first federal appellate court to go that far is imprudent, I respectfully dissent.

## I.  FACTS AND PROCEEDINGS

As the underlying facts are undisputed, I adopt the majority opinion's detailed recitation of the facts, supplementing it with the following observations contained in the record. The technical codes here at issue are not mere compilations; rather they are original, "from scratch" creations by SBCCI which rightfully enjoy copyright protection from their inceptions. In each of its codes,

SBCCI asserts a copyright under which it claims the exclusive right to publish these codes or license their reproduction and publication. Despite its copyright, SBCCI ensures free access by specifying that once a governmental unit enacts such a model code into law, copies must be made available for inspection by the public in the enacting government's offices. As a general proposition, members of the public may make or obtain copies of portions of the adopted versions of SBCCI codes from city offices or local libraries, or may purchase copies of the codes directly from SBCCI and from some third-party sources, such as bookstores.[23]

Several municipalities in North Texas have adopted SBCCI's codes, including the towns of Anna and Savoy. Veeck avers that he attempted to obtain a copy of the building code of his hometown of Denison, Texas, after learning that it had adopted SBCCI's Model Building Code as its own. Failing to locate Denison's building code at local bookstores or libraries, Veeck ordered copies of the codes that SBCCI had produced. He ordered these copies in electronic format directly from SBCCI.[24] According to Veeck, he

---

[23] As noted by the majority members and nonmembers are charged different prices for copies of the codes. For example, members were charged $48 for a copy of SBCCI's 1994 Standard Building Code, for which nonmembers were charged $72.

[24] The record is not completely clear, but it appears that Veeck made no attempt to view or copy the codes in the Denison city clerk's office. When Veeck received the 1994 codes from SBCCI, he realized that Denison had adopted the 1988 version of the building codes. He posted the 1994 codes on his Internet site despite the fact that they were not the same as the version adopted by Denison.

later visited approximately twenty towns in North Texas, including Anna and Savoy, in an effort to obtain copies of their local building codes, not all of which had been produced by SBCCI. Veeck was not able to buy complete copies at any of the towns that he visited.[25] He apparently never attempted to view or copy the SBCCI codes in any city clerk's or other municipal offices of the towns that had enacted the codes by reference.

In contravention of the software license agreement and copyright notice included with the electronic version of the model codes he purchased from SBCCI, Veeck failed to identify the codes as the products of SBCCI when he posted them on his website. Instead, he simply (and inaccurately)[26] identified them as the building codes of Anna and Savoy, Texas. As detailed in the majority opinion, the litigation ensuing from this conduct culminated with the grant of summary judgment in favor of SBCCI on its claims for copyright infringement. As Veeck cannot legitimately find a safe haven in any of his affirmative defenses, the district court's order should have been affirmed.

---

[25] It appears that in some of the cities, the correct version of the building code was not available at alternative locations. For instance, Sherman, Texas, had adopted the 1997 version of the building code, but the local library had only the 1994 version on hand.

[26] Veeck did not include the enacting ordinances of either municipality. Anna's enacting statute, for example, includes ordinances resolving conflicts between the adopted SBCCI code and previous city laws and also includes a clarification regarding which city officials would be responsible for enforcing different sections of the code.

## II. ANALYSIS

### A. Standard of Review

This case is on appeal from a grant of a summary judgment that dismissed Veeck's declaratory judgment action and granted SBCCI's requested copyright infringement and damages relief. We review the record de novo, applying the same standard as the district court.[27]

### B. Merits

#### 1. Overview

Despite the efforts of Veeck (and of those amici who support him and of the en banc majority opinion) to paint this case as a broad one with dire constitutional implications, the question before us is truly quite narrow. In fact, it is the majority opinion that creates drastic constitutional alterations by ruling in Veeck's favor, thereby improvidently decreeing an absolute and inflexible rule, ill-suited for modern realities. Conversely, had we held for SBCCI, we would have remained well within the precedential and persuasive boundaries of established copyright law. My analysis is necessarily delimited by the particular, undisputed facts of the case: Veeck is a non-commercial, non-educational, non-contractor, non-official, non-resident of either Anna or Savoy, who purchased a copyrighted work, replete with warnings about infringement, and published that work virtually in its entirety on the internet. Veeck published on his website the

---

[27] Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

40

entire substantive portion of the model building code that he purchased from SBCCI, redacting only the identity of the code's author (SBCCI) and the statement that the code was copyright protected, and inserting that they were the codes of Anna and Savoy. Veeck's only professed justification for infringing SBCCI's copyrights was that two or more small municipalities in northern Texas —— of which Veeck was neither a resident nor otherwise related to in any capacity, official or unofficial —— had, at the invitation of the code's author, enacted the codes into law by reference. Because he cannot, Veeck does not contend that Anna or Savoy denied him access to their codes or that he (or anyone else) was unable to view the law to which the citizens of Anna and Savoy are subject. Had Anna, Savoy, or SBCCI blocked the code's availability, I would be among the first to recognize Veeck's (and anyone else's) right of access to "THE law." That, however, is simply not the case before us; this is <u>not</u> a free access case and cannot be so classified.

Under this narrow set of facts, Veeck prevails only because the en banc majority ruled favorably on at least one of his affirmative defenses,[28] without which, his publication of the codes is indisputably an infringement of SBCCI's copyright. Given Veeck's global re-publication of SBCCI's copyrighted model codes,

---

[28] Veeck advanced defenses grounded in due process, public domain, fair use, waiver, copyright misuse, merger, and free speech.

41

his at-best remotely tangential relationship to the codes and other laws of Anna and Savoy, his inability to present evidence that he was denied access to the towns' codes by the towns or SBCCI, the countervailing public policy concerns supporting copyright protection, and the direction and intent of recent congressional enactments and appellate case law, we should not have condoned Veeck's violation of SBCCI's copyright.

Reduced to its bare essentials, the majority's holding in favor of Veeck indisputably enacts the blanket, per se rule that once a copyrighted work is enacted into law by reference, it loses its entire copyright protection, ipso facto, regardless of the nature of the author, the character of the work, or the relationship of the copier to the work or to the governmental subdivision that enacted the work into law through incorporation by reference. Such an extremely broad and inflexible rule propels the majority's holding far beyond the ambit of Congress's enactments, the Supreme Court's pronouncements, and the opinions of other appellate courts that have addressed similar issues. Yet the possibility of obtaining such an all-encompassing ruling constituted Veeck's only hope of overcoming SBCCI's copyright protection vis-à-vis an otherwise admitted infringer who is too attenuated from anything that might otherwise excuse the unauthorized copying of these codes cum ordinances, such as a "need to know" for purposes of complying with one or more provisions of the codes. Veeck meets none of these criteria.

42

2. <u>Due Process/Public Domain</u>

a. <u>Absence of Controlling Legal Authority</u>

In the absence of an expressed pronouncement from either the Supreme Court or Congress,[29] our creation of an automatic rule rendering the copyright of a model code nugatory <u>per</u> <u>se</u> when and if it is enacted into law is unwise, imprudent, and far in excess of our authority.  <u>Before</u> such a work is enacted into law, the Copyright Act unquestionably affords copyright protection to its author; and Congress has given no indication that, on enactment, this protected status evanesces <u>ipso</u> <u>facto</u> as to the whole universe of potential copiers.[30]  As I discuss in greater detail below, recent congressional enactments and accompanying federal agency

---

[29] <u>Cf</u>. <u>CCC Information Services, Inc. v. Maclean Hunter Market Reports (CCC)</u>, 44 F.3d 73-74 (2d Cir. 1994) (discussing whether the Red Book, which was adopted by States as the legal standard for car valuations, passed into the public domain by virtue of its reference into the law):

> The [public domain] argument is that the public must have free access to the content of the laws that govern it; if a copyrighted work is incorporated into the laws, the public need for access to the content of the laws requires the elimination of the copyright protection.
> ...
> <u>No authority cited by CCC directly supports the district court's view</u> [the view that the Red Book had passed into the public domain].
> ...
> <u>We are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright</u>. (emphasis added).

[30] <u>Cf</u>. <u>County of Suffolk v. First American Real Estate Solutions</u>, 261 F.3d 179, 193 (2d Cir. 2001) ("The determination that no one may own a copyright in statutes and opinions arises not from a specific provision of the Copyright Act, but from a 'judicial gloss' on the Act.") (citation omitted).

43

policies strongly predict that, were Congress to address the issue here presented, it would preserve the protection of SBCCI's copyright, at least under circumstances like those we consider today.[31]

As for the Supreme Court, its most analogous opinion, Banks v. Manchester, falls markedly short of answering the question.[32] The Court grounded its century-and-one-quarter old Banks holding —— that judicial opinions cannot be copyrighted —— in the logic that, as the product of judges who are paid from public coffers and elected or appointed for the sole purpose of interpreting and applying the law, judicial opinions can never be copyrighted.[33] Thus Banks turns not on the nature of the work but on the nature of the author. By its own terms, the Banks holding is obviously limited to the work of taxpayer-paid public officials who produce or interpret the law. The majority's stretching of Banks to the facts of the instant case constitutes a clear overreaching that finds no definitive support from any controlling authority.

---

[31] See, e.g., National Technology and Transfer Act of 1995, P.L. 104-113, § 12(d), 110 Stat. 783 (1996); OMB Circular A-119, 63 Fed. Reg. 8545, 8555 (Feb. 19, 1998).

[32] Banks v. Manchester, 128 U.S. 244, 253 (1888) (holding judicial opinions uncopyrightable because they are created by judges paid from the public's coffers); see also Wheaton v. Peters, 33 U.S. 591, 668 (1834) (same).

[33] This rationale is also applicable to statutes created by legislators paid by public funds.

In the absence of expressed congressional guidance or directly controlling Supreme Court precedent, we were left to address —— prudentially —— a wide-open and unresolved question of copyright law:  Should the entirety of a privately confected and promulgated model code, access to which has been denied to none, lose its copyright protection in toto, against all the world, solely by virtue of its enactment into law by reference?  If Congress or the Supreme Court wishes to strip totally the copyright protection otherwise enjoyed by model codes as an automatic result of being enacted into law, and to justify such emasculation by invoking the doctrines of free speech, due process, merger, or the like, that would be their prerogative.  Prudence demands, however, that so large a step beyond all established legal boundaries should not have been taken first by an intermediate appellate court.  Indeed, recent appellate case law, congressional pronouncements, and federal agency actions, predict the diametrically opposite result: a discernable trend towards greater governmental adoption of privately created codes with concomitant retention of copyright protection, tempered, of course, by express or implied consent or waiver —— or even fair use —— for those officials, residents, contractors, subcontractors, and design professionals who have a need to view and copy portions of codes to comply with their provisions.

b.  <u>Policy Analysis for Copyright Protection</u>

What Banks and other opinions undeniably teach about assessing the copyright protection of works like the codes here at issue is that "[t]he question is one of public policy...."[34] Accordingly, these decisions do not stand for the abstract and generic proposition that all law qua law, regardless of its form, authorship, or content, is automatically unprotected fair game as to all copiers, without distinction. Hence, courts are given the weighty task of balancing, on the one hand, the policy concerns that favor the constitutionally mandated retention of copyright protection for privately authored works and, on the other hand, the policy concerns that would permit stripping the author of a privately created work of copyright protection once that work is enacted into law. I do not dismiss lightly the policy considerations supporting this latter concern. Yet, when properly limited to the narrow set of facts before us, the scale of countervailing policy considerations is tipped —— slightly yet undeniably —— in favor of enforcing SBCCI's copyright, vis-à-vis Veeck and any others (but only they) who are identically situated.

---

[34] Banks, 128 U.S. at 253; see also CCC, 44 F.3d at 68: We reach this conclusion [reversing summary judgment in favor of a publisher who copied portions of appellant's used car valuations which were referenced by state statutes] based on the need to balance the conflicts and contradictions that pervade the law of copyright, and the need, where elements of copyright law conflict, to determine, as a policy judgment, which of its commands prevails over the other. (emphasis added).

I begin with an assessment of the policy consideration supporting Veeck's position —— namely, the due process and public domain concerns. As an initial matter, the type of due process asserted by Veeck is murky at best. He was not denied access to the codes by either the towns or SBCCI (indeed, he has never alleged that he even tried to attain access directly from either town, or his home forum for that matter), and he was never charged with or prosecuted for a code violation;[35] therefore, his claim cannot be based on procedural due process. And, inasmuch as copyright is a federal law, no state action could deprive him of a fundamental right that would trigger a substantive due process claim. Neither has Veeck pointed to any state actor who has purportedly denied him due process. Yet despite his unimpeded access to the law and the absence of state action, Veeck argues amorphously that his due process rights somehow allow him freely to copy and publish otherwise copyright-protected codes once they are enacted into law by reference.

I reiterate for emphasis that this would be an entirely different case if Veeck's (or anyone's) access to the law had been denied or obstructed; instead, we deal here only with Veeck's bald pronouncement —— now legitimated by the majority opinion —— that, once a code is enacted into law, due process does not merely afford

_____

[35] Should some municipality, or SBCCI, ever truly restrict the public's free access to the enacted codes, any defendant prosecuted for violating sections of the building codes would surely prevail on a due process defense.

47

him access, but also gives him unfettered copying and dissemination rights.[36]  The majority's acceptance of Veeck's position is truly a novel extension of any prior judicial recognition of a due process right.  True enough, Veeck can copy and publish judicial opinions and statutes on his website with impunity.  He can do so, however, not because of his due process rights, but rather because — as judicial opinions and legislatively drafted statutes have never enjoyed copyright protection, could never enjoy such protection, and are in the public domain from the moment of their inception — such works are entitled to no copyright protection or restrictions.[37]

Logically then, the only possible support for Veeck's due process position is his wholly unsupported assertion that, by virtue of their adoption into law by reference, the codes have entered the public domain and are therefore denuded of all copyright protection whatsoever, regardless of their content or the identity of the author or other interested parties.  According to

---

[36]  Cf.  Practice Management Information Corp. v. American Medical Association (Practice Management), 121 F.3d 516, 519 (9th Cir. 1997) (in denying the Practice Management's due process/public domain argument, the court noted "Practice Management is not a potential user denied access to the CPT, but a putative copier wishing to share in AMA's statutory monopoly.  Practice Management does not assert the AMA has restricted access to users or intends to do so in the future.").

[37]  Moreover, as further discussed infra, wide, unrestricted dissemination of opinions and statutes has no possible harmful effects on the "creativity" of those who author judicial opinions and statutes; their jobs and their compensation have no nexus to their creativity, and vice versa.

48

Veeck —— and now our en banc majority —— simply by virtue of their adoption into law, SBCCI's model codes have become "THE law"; and as THE law, all THE people (not just those who may be deemed metaphysically to have been the authors by virtue of their elected legislatures' acts of adoption) have an absolutely unfettered right to do whatever they please in the way of copying and publishing, in total disregard of the author's otherwise valid and enforceable copyright.

Admittedly, the majority's argument finds rhetorical support from the First Circuit's dicta in Building Officials & Code Admin. V. Code Technology, Inc. (BOCA), in which that court stated "[t]he citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions because the law derives its authority from the consent of the public, expressed through the democratic process."[38] Undoubtedly, this metaphorical concept of citizen authorship cum ownership has great symbolic, "feel-good" appeal. The majority's uncritical application of that proposition to the instant case, however, naively treats all manifestations of "THE law" in our increasingly complex society monolithically and without differentiation. The Supreme Court took no such position in Banks; in fact, Banks addresses only judicial opinions and other pronouncements of the law created ab initio by

---

[38] BOCA, 628 F.2d 730, 734 (1st Cir. 1980).

49

publically paid officials.[39]  Furthermore, although the symbolic position advanced in BOCA's grandiloquent dicta ostensibly contemplates a broad application for the proposition of citizen authorship and control, BOCA's actual holding is very narrow and unrelated to any such abstract musings about the democratic process.

In fact, the BOCA court expressly avoided deciding whether BOCA's model code retained its copyright after enactment, noting that "the rule denying copyright protection to judicial opinions and statutes grew out of a much different set of circumstances than do these technical regulatory codes...."[40]  Therefore, the majority's rote application of the lofty platitude of citizen ownership of "THE law," without exploring the distinctions between different types of enactments and the policy considerations attendant on each, is far too simplistic.  Such an analysis is inconsistent with the thorough policy evaluations evidenced by those courts that heretofore have deliberated on similar copyright issues.[41]

---

[39]  County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179, 194 (2d Cir. 2001) ("Banks is properly read as requiring a determination whether the particular governmental entity or employee has adequate incentive to create the work absent copyright protections.").

[40]  BOCA, 628 F.2d at 736 (emphasis added).

[41]  See Banks, 128 U.S. 244; County of Suffolk, 261 F.3d 179 (2d Cir. 2001); Practice Management, 121 F.3d 516 (9th Cir. 1997); CCC, 44 F.3d 61 (2d Cir. 1994); BOCA, 628 F.2d 730 (1st Cir. 1980).

The privately created model codes enacted into law in this case are easily distinguishable from judicial opinions or statutes in several important respects. First and most obviously, model codes are not created by elected or appointed officials paid from public fisc, rendering inapt the mythical concept of citizen authorship. Indeed, to the exact opposite, rather than producing regulatory codes themselves, the officials elected as the citizens' voice chose, on behalf of their constituents, not to head down the long, expensive, and highly technical road of special code drafting, opting instead to adopt, cost-free, codes authored by private entities, because doing so is convenient, efficient, and cost-effective.

Second, these narrowly focused codes are detailed and complex, requiring technical expertise on the part of the author. Third, they are of limited, highly specialized effect as to who has a real interest and is actually affected, unlike judicial opinions and statutes, which generally have broad if not universal application.

Finally, Congress itself has provided the strongest support for the proposition that these privately created codes should be treated differently than other laws. Recognizing that the production of a comprehensive technical code requires a great deal of research, labor, time, and expertise, Congress in the National Technology and Transfer Act of 1995 (the "NTTA") expressly directs that "Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus

51

standards bodies...."[42] The OMB, in its Circular A-119, which was designed to provide guidance to federal agencies in the wake of the NTTA, requires that "[i]f a voluntary standard is used and published in an agency document, your <u>agency must observe and protect the rights of the copyright holder and any other similar obligations</u>."[43] These pronouncements by Congress and the OMB strongly evince a recognition that the privately created regulatory

---

[42] National Technology and Transfer Act of 1995, P.L. 104-113, § 12(d), 110 Stat. 783 (1996). I note that although the NTTA and the OMB Circular address the policy of using privately created <u>standards</u> and retaining copyright protection for those standards, they are still wholly applicable to the analysis of privately created <u>codes</u>. Rather than a substantive, meaningful legal distinction, Congress's and the OMB's references to "standards" rather than "codes," in all likelihood reflects the difference between federal and local lawmaking. Federal law, because it does not govern the safety and building ordinances of states or municipalities, generally addresses national <u>standards</u> instead of specific safety and building requirements embodied in a <u>code</u>. In substance, though, technical codes are "standards;" for purposes of today's decision, those terms are synonymous. The majority's purported distinction between standards and codes is far too narrow to decide the instant case on those grounds — it is a paradigmatic example of a distinction without a difference. The same principles that apply to the analysis of privately created standards apply to privately created codes — both deal with the protection afforded to privately organized and authored collections of hyper-technical data for use in a specialized segment of today's complex society that benefits from uniformity in those data. This understanding is supported both by appellate case law and evidenced by the standards-creating bodies filing amicus briefs in support of SBCCI's position. <u>See</u> <u>Practice Management</u>, 121 F.3d at 518-19 ("As the AMA points out, invalidating its copyright on the ground that the CPT entered the public domain when HCFA required its use would expose copyrights on a wide range of privately authored <u>model codes, standards, and reference works</u> to invalidation.") (emphasis added); <u>see</u> <u>also</u> amicus filed by, <u>inter alia</u>, American National Standards Institute in support of SBCCI.

[43] OMB Circular A-119, 63 Fed. Reg. 8545, 8555 (Feb. 19, 1998)(emphasis added).

codes and standards differ greatly from either judicial opinions or a statutes. Technical codes are indispensable resources in today's increasingly complex, high-tech society, and they deserve authorship protections not afforded to other types of "THE law."

The First Circuit's overbroad dicta in BOCA was announced in 1980, well before the advent of the internet and well before the announcement of the federal government's legislated policy directing the adoption of privately created codes to serve the principles of efficiency and economic competition.[44] Moreover, recent appellate case law supports the recognition of the clear differences between, on the one hand, privately developed standards that are adopted into law by reference and, on the other hand, law created by legislators and judges.[45] Thus, the majority's

---

[44] Id. at 8554:
The use of such standards, whenever practicable and appropriate is intended to achieve the following goals:
   a.  Eliminate the cost to the Government of developing its own standards and decrease the cost of goods procured and the burden of complying with agency regulation.
   b.  Provide incentives and opportunities to establish standards that serve national needs.
   c.  Encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization [uniformity] of standards.
   d.  Further the policy of reliance upon the private sector to supply Government needs for goods and services. (emphasis added)

[45]  See County of Suffolk v. First American Real Estate Solutions, 261 F.3d 179 (2d Cir. 2001) (developing a two-pronged economic incentive/public need test to determine whether tax maps developed by the County of Suffolk were in the public domain from inception and therefore stripped of copyright protection; citing

53

superficially appealing contention that from a policy perspective, "THE people" may do as they please with "THE law" rests on the flawed foundation that "THE law," irrespective of whether it be in the form of opinions, statutes, or regulatory standards or codes —— and irrespective of by whom it is "made" —— should be treated identically.  Modern realities and case law directly contradict this simplistic abstraction: The policy considerations that dictate unlimited and unrestricted publishing of judicial opinions and statutes simply do not appertain here.

The policy concerns supporting the retention of at least some copyright protection for SBCCI are more persuasive and probative. First and most importantly, unlike judges and legislators who are paid from public funds to issue opinions and draft laws, SBCCI is a private sector, not-for-profit organization which relies for its existence and continuing services, in significant part, on revenues from the sale of its model codes.[46]  The necessity of maintaining

---

Practice Management and the panel opinion in Veeck, deciding that, as a matter of law, the county's tax maps were not in the public domain); Practice Management, 121 F.3d 516, cert. denied, 522 U.S. 933, opinion amended by 133 F.3d 1140 (finding that the American Medical Association did not lose the right to enforce its copyright when use of its promulgated coding system was required by government regulations); CCC, 44 F.3d 61, cert. denied, 516 U.S. 817 (upholding copyright of privately prepared listing of automobile values that states required insurance companies to use); see also 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 5.06[C], at 5-91 (2000) ("It is questionable whether [the due process clause] justifies the denial of copyright to a private person or group who produces such a model code.").

[46]  Approximately one-third, or $3 million, of SBCCI's annual $9 million dollar revenue is generated by sales of model codes to

the economic incentive of copyright protection for these private entities prompted the Ninth Circuit to rule in favor of the AMA's retention of its copyright in the Physician's Current Procedures Terminology ("CPT") despite a federal agency's adoption of the CPT:

> The copyright system's goal of promoting the arts and sciences by granting temporary monopolies to copyrightholders was not at stake in <u>Banks</u> <u>because judges' salaries provided adequate incentive to write opinions. In contrast, copyrightability of the CPT provides the economic incentive for the AMA to produce and maintain the CPT.</u> "To vitiate copyright, in such circumstances, could, without adequate justification, prove destructive of the copyright interest, in encouraging creativity," a matter of particular significance in this context because of "the increasing trend toward state and federal adoptions of model codes."[47]

This approach is also consistent with the Second Circuit's two pronged test in <u>County of Suffolk</u> for determining whether a work may be deemed to be in the public domain: "(1) whether the entity or individual who created the work needs an economic incentive to create or has a proprietary interest in creating the work and (2) whether the public needs notice of this particular work to have notice of the law."[48]  Here, without the ability to control unrestricted gratuitous dissemination of its model codes, SBCCI

---

contractors and other interested parties.  The remaining revenue is mainly derived from the annual fees of voluntary members and member organizations.  Voluntary members include scholars, builders, contractors, and governmental entities that have adopted the code.

[47] <u>Practice Management</u>, 121 F.3d at 518 (quoting 1 Nimmer on Copyright § 5.06[C], at 5-92 (1996))(emphasis added).

[48]  <u>County of Suffolk</u>, 261 F.3d at 194.

would lose significant revenue, in turn substantially impinging on the financial incentive and ability to continue creating and revising its model codes, absent some alternative source of funds.[49]

The importance of affording organizations like SBCCI protection from attenuated third parties like Veeck — even when motives are pure and unfair financial competition is not the goal — is best underscored by verbalizing the natural consequence of reducing the revenues, and thus the creative incentives, for organizations like SBCCI. Without private code-creating entities, our smaller towns — and even some of our larger cities, states, and agencies of the federal government — would be forced to author their own regulatory codes. Such a task would inefficiently expend the time and resources of the legislative and executive bodies of these governmental entities, not to mention the question of available expertise. To create codes of appropriate detail, accuracy, and information, governmental bodies would have to enlist the aid of technical experts, undoubtedly at considerable cost. Finally, causing municipalities, states, and the federal agencies to engage in this activity could lead to innumerable variations of any given code, thereby undermining uniformity and, with it, safety

---

[49] We note here that the second prong of the County of Suffolk test is no barrier. As stated above, although the codes are necessary for a citizen to have proper notice of the building code regulations of Anna and Savoy, no allegations have been made here to suggest that Veeck was denied notice or access to the codes. We stress that the right of unlimited republication is a far cry from the rights of access to and notice of the law.

and efficiency. For small towns like Anna and Savoy, such a result could be even more detrimental, as their limited resources well might be insufficient to absorb the costs of creating their own codes. Ultimately, taxpayers would end up paying for a service that is currently provided efficiently, expertly, and at no expense to them.

I hasten to add that, for my analysis to have force, SBCCI need not be put completely out of business. Continued maintenance of a revenue source from sales of codes to individual owners, architects, engineers, materials suppliers, builders and contractors as well as libraries and other more attenuated purchasers, all of whom buy copies of the codes directly from SBCCI, serves another public interest. I refer to the continuation of SBCCI's independence from the self interest of its dues-paying members, who otherwise might be in a position to command more influence were SBCCI forced to obtain too great a share of its revenue from such supporters. Clearly, SBCCI's receipts from sales of the codes substantially reduces the potential for greater dependence on its membership, presumably allowing SBCCI to operate without becoming entirely beholden for its existence to self-interested entities.

Finally, denying the Veecks of the world unrestricted republication and dissemination rights does not obstruct reasonable and necessary usage of and compliance with the adopted codes. I remain confident that the copyright doctrines of fair use and

implied license or waiver are more than adequate to preserve the ability of residents and construction industry participants to copy any portions of the code that they want or need to view. The fair use doctrine would also protect the use of the code, or portions of the code, as a teaching tool and would allow experts, lawyers, and judges freely to cite the code in their briefs or opinions without infringing SBCCI's copyright. These existing internal safeguards in copyright law show up the majority's dire predictions for the unrealstic hyperbole that they are.

It is important to keep in mind the record reality that neither Anna and Savoy themselves, nor builders, contractors, design professionals, or residents of Anna or Savoy, have complained of denied <u>access</u> to the codes or being hampered in their efforts to use, copy, or comply with the codes in a manner consistent with copyright law. Thus, the well-established doctrines of implied license and fair use preserve the public interest by allowing copyright protection to co-exist peacefully with all convenient and necessary use of the model codes.

In sum, Veeck has no real support for his infringement, being relegated to his abstract solipsism that due process immunizes any republication of the SBCCI's model codes once they are enacted into law by reference. This court's en banc majority holding today ignores case law from the Supreme Court and other appellate courts, which have instructed us that our conclusion here cannot be based on absolute or generic pronouncements regarding the nature of THE

law. Instead we should reach our conclusion only after a careful weighing of the policy considerations of due process and copyright law in the unique framework of the particular facts of each case. Moreover, to the extent that recent congressional enactments and federal agency policies give guidance, they indicate that SBCCI's copyright protections should be respected despite adoption of its codes into law.

Summarizing all pertinent factors — (1) the lack of controlling precedent from the Supreme Court or specific guidance from Congress on the issue, (2) federal law and federal agency policy encouraging the adoption of model codes and increasing the trend toward federal and state adoption of model codes, (3) the palpable distinction between the model codes at issue here and judicial opinions or legislative enactments, (4) case law from our fellow circuits that supports the retention of copyright protection even after adoption by reference into law, (5) the complete absence of any denial of access, (6) the truism that neither due process nor the metaphorical concept of citizen ownership of the law mandates totally unrestricted publication of adopted model codes, (7) SBCCI's identity as a private not-for-profit company which, unlike courts and legislatures, needs self-generated financial resources to continue independently creating and modifying its codes, (8) the knowledge that governmental obtain, free of cost, accurate, efficient and uniform regulatory codes which otherwise would be time-consuming and expensive (if not impossible in many

59

instances) to develop in SBCCI's absence, and (9) the comfort that all reasonable and necessary use, copying, and republication by building owners, builders, contractors, design professionals, teachers, lawyers, as well as citizens and officials of the towns themselves, is assured protection by the fair use and implied license doctrines —— convinces me that the public policy scale is tipped in favor of enforcing SBCCI's copyright protection against Veeck, who has never been denied access to the codes of Anna and Savoy and almost certainly never will be (but, if he ever is, he has alternative remediation available).

Finding that, on balance, these policy considerations favor SBCCI, I would conclude as a matter of law that, despite being adopted into law, SBCCI's codes are not in the public domain, and that Veeck's due process rights cannot be stretched far enough to permit his completely unrestricted copying and dissemination of SBCCI's codes. Veeck's other statutory and constitutional defenses similarly fail.

3.  <u>The Idea/Expression Dichotomy and Merger</u>

Veeck insists (and now a majority of the active judges of this court agree) that the model codes lose their copyright protection by virtue of the idea/expression (or fact/expression) dichotomy in copyright law.[50] Veeck's basic contention is that when a model code

---

[50]   17 U.S.C. § 102(b):
In no case does copyright protection for an original work of authorship extend to an idea, procedure, process, system, method of operation, concept, principle, or

is enacted into law by being adopted by reference, it automatically metamorphoses from "expression" to emerge as an "idea" —— and that as an idea, it cannot be protected.[51] Relatedly, he contends that the doctrine of "merger" applies to nullify protection for expressions of an idea any time that there are only one or a very limited number of ways to express a given idea.[52] The cornerstone of both arguments is the definition of "idea" in the context of a model code that has been enacted by reference.

a. Defining "Idea"

Veeck's argument fails because it misapprehends and misapplies the "idea" concept in copyright law. "Idea" in copyright law is a

---

discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.
see also Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991) ("[C]opyright law assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship.")

[51] Mason v. Montgomery Data, Inc. 967 F.2d 135, 138 (5th Cir. 1992) ("Thus, while a copyright bars others from copying an author's original expression of an idea, it does not bar them from using the idea itself.") (emphasis in original)

[52] Id. at 138:
In some cases, however, it is so difficult to distinguish between an idea and its expression that the two are said to merge. Thus, when there is essentially only one way to express an idea, "copying the 'expression' will not be barred, since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law." (citations omitted).

term of art which does not track its everyday, dictionary meaning. What constitutes an "idea" in the lexicon of copyright law cannot be determined by empirically analyzing a given fact situation until the nascent dividing line between the "idea" and its "expression" finally crystallizes; indeed, just the reverse is true. Case law reveals that identification of the "idea" in a work is not the starting point but the result of a judicial exercise that in turn is highly dependent on the precise factual situation being tested.[53] Therefore, designation of the enacted code as an idea vel non is a legal conclusion to be reached by a court, not an initial factual finding to be gleaned intuitively. That determination of idea is not antecedent to a policy determination regarding the "copyrightability" of the code; to the contrary, it is the logical

---

[53] Id. ("A court's decision whether to apply the merger doctrine often depends on how it defines the author's idea. For this reason, in defining the idea the courts should be guided by 'the balance between competition and protection reflected in the patent and copyright laws.'")(citations omitted); Peter Pan Fabrics, Inc. v. Martin Wiener Corp., 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)(discussing what the court termed as "verbal works," the court stated "[T]here can be no copyright in the 'ideas' disclosed but only in their 'expression.' Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc."); see also Nimmer on Copyright § 13.03[B][2][a] at 13-60 ("Merely stating the rule [17 U.S.C. § 102(b)], however, does not make any easier the task of drawing the line between where the idea ends and expression begins.").

end-product reached after competing concerns are weighed judicially.[54]

Courts frequently must decide how and at what level to draw the juridical line between idea and expression for copyright purposes. Judge Learned Hand, applying the idea/expression dichotomy to determine if one author's play infringed the work of another playwright, remarked:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property never extended. Nobody has ever been able to fix that boundary, and nobody ever can.[55]

Our task in this case should have been to decide whether the "idea" embodied in the code is defined, at one extreme of the continuum, as the entire code itself in its tangible form, or if instead the

---

[54] Cf. Nimmer on Copyright § 1.10[B][2] at 1-78 ("On the whole, therefore, it appears that the idea-expression line represents an acceptable balance as between copyright and free speech interests") (citing United Video, Inc. v. F.C.C., 890 F.2d 1173, 1191 (D.C. Cir. 1989)).

[55] Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930). Commentators and courts have labeled this as Judge Hand's "abstractions test."

"idea" is defined at a more removed and abstract level further along that continuum.

My foregoing analysis has already demonstrated that the policy considerations weigh in favor of granting SBCCI protection against Veeck and other copiers and republishers identically situated. Having laboriously arrived at this conclusion, and accepting that a building code can be expressed in myriad ways, I am convinced that the code in its tangible entirety is not the unprotected "idea" in this situation.[56] None question that this is true for codes that have not been enacted globally into law by reference, and nothing of which I am aware can magically change the _expression_ that is the copyrighted code into a copyright _idea_ by the simple act of adoption as a body of law. Today I need not, and therefore do not, attempt to answer the question of exactly where to draw the line and define the idea presented here. It suffices that the idea at issue in the code is substantially more abstract than the physical entirety of the code itself; so as a matter of law, the code as a unitary whole is _not_ an "idea" to be denied copyright protection absolutely, but rather is one among a significant number of possible "expressions."

b. _Merger_

---

[56] In doing so, I acknowledge that specific portions and discrete facts within the code could be considered facts or ideas, and therefore unprotectable.

Libertarian advocates of freedom from essentially all copyright protection attempt to find a safe harbor in the merger doctrine as a last resort when they do not prevail on the idea/expression dichotomy. The merger doctrine, however, is a limited exception in copyright law, intended to shelter only those rare cases in which the "idea" is susceptible of more than one expression, but the number of possible expressions is so finite and small as to have effectively "merged" with the idea.[57] Similar to the general misconception of the idea/expression dichotomy, the widely misunderstood merger doctrine also depends on the level of abstraction at which the court defines the "idea" that is alleged to have merged with its expression.[58]

Again, Veeck can find no immunity in the merger doctrine because there exists a plethora of ways to express a building code, thereby making the merger doctrine inapplicable. Although some among the many highly specific, technical, and detailed provisions within a building code might be susceptible of being expressed in only one or a handful of ways —— and thus conceivably be subject to merger —— a total, unitary building code, in globo, may be written, organized, and presented in any one of innumerable forms. All concede that many code-drafting organizations like SBCCI exist and that they are constantly creating competing versions of topical

---

[57]    See generally CCC, 44 F.3d at 68; Nimmer on Copyright § 13.03[B][3] at 13-68 – 13-73.

[58]    See supra note 37.

codes; yet each is <u>expressed</u> differently –– and each is copyrighted.  As there exist considerably more than a tiny, finite number of ways to express a building code, the merger doctrine is inapplicable and thus unavailable to insulate Veeck's infringement from copyright protection.

>   4.  <u>Other Affirmative Defenses to Copyright Infringement</u>

Veeck also contends that even if the codes are not in the public domain and cannot be classified as "ideas," his code copying and dissemination activities are protected by the doctrines of free speech, misuse, waiver, and fair use under copyright law.[59]  I address each of these contentions in turn.

>   a.  <u>Free Speech</u>

None contends that SBCCI made any attempt to use its copyright to block or interfere with the public's access to the municipal codes of Anna and Savoy, Texas.  In <u>Schnapper v. Foley</u>, the District of Columbia Circuit held that the First Amendment does not require the voiding of a copyright, even in a government-commissioned work, absent evidence that access to the work had been denied.[60]

---

[59]  Another defense, implied license, was raised by amicus curiae Association of American Physicians & Surgeons, Inc., but was not addressed by either party in the district court or on appeal. Hence, I do not address it.  <u>See</u> <u>Christopher M. v. Corpus Christi Indep. Sch. Dist.</u>, 933 F.2d 1285, 1292 (5th Cir. 1991).

[60]  667 F.2d 102, 115-16 (D.C. Cir. 1981).

Dealing only with the record facts, I find that Veeck's Free Speech defense is further weakened by what he did not do: He did not first obtain copies of the codes of these two cities and then publish them on the Internet. Instead, he purchased directly from SBCCI a copy of all its 1994 Standard Codes, which arrived bearing a copyright notice and a license agreement. Ignoring these, Veeck copied that set onto his computer and posted it on his own website, identifying it as containing the municipal codes of the two towns but without advising the identity of the author or the fact of copyright. That which Veeck did and that which he did not do are inherently different: What he did not do comes closer to an interested party's fair use of his local building code;[61] what he did exemplifies a purchaser who assumes the risk of actively disregarding the intellectual property rights held and announced by the author/supplier of a commercial product.

Factually, in enforcing its copyright in its model codes, SBCCI simply is not stifling access to, or speech about, THE law. SBCCI has not violated the First Amendment vis-á-vis Veeck.

b. Misuse

The equity-based defense of copyright misuse, which prevents a culpable author from prevailing in an action for the infringement of a misused copyright, "'forbids the [copyright holder's] use of the copyright to secure an exclusive right or limited monopoly not

---

[61] Veeck's fair use defense is discussed further infra.

granted by the Copyright Office and which is contrary to public policy to grant.'"[62]  In Practice Management, the Ninth Circuit concluded that the American Medical Association misused its copyright when it licensed its coding system to the Health Care Financing Administration.  The copyright misuse was the AMA's imposition of a condition on its grant of a license that the licensee-agency agree not to use any competing system.[63]  Veeck, in contrast, has raised no genuine issue of material fact regarding any purported misuse by SBCCI of its copyright.  The summary judgment record is devoid of evidence that the organization mandates the exclusive use of its codes or any other of its services as a condition of a governmental subdivision's adopting one of the codes.  There is thus no record evidence of facts constituting misuse that in turn would prevent enforcement of SBCCI's copyright.

   c. Waiver

Neither can Veeck prevail on his assertion that SBCCI expressly or impliedly waives its entitlement to copyright protection vis-á-vis the whole world when it successfully encourages municipalities to adopt its codes by reference.  I readily concede that a copyright can be waived by the author's

---

[62] DSC Communications Corp. v. DGI Techs., Inc., 81 F.3d 597, 601 (5th Cir. 1996) (quoting Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 977 (4th Cir. 1990)).

[63] Practice Management, 121 F.3d at 520.

inaction.[64]  Here, however, SBCCI expressly reserved its copyright in the codes.  The district court found undisputed the fact that the materials Veeck received from SBCCI "contained the copyright expressions of the Defendant."  Having concluded that SBCCI's codes are not in the public domain and that due process does not require suppression of SBCCI's copyright, I am convinced that the organization has done nothing to waive copyright protection expressly.

Copyright also may be waived implicitly by virtue of a particular act, even if waiver was neither explicit nor the intended result.[65]  Veeck's argument in this regard is that by encouraging the towns to adopt the codes, SBCCI impliedly waived its copyright protection.  This presupposes that waiver must be an "all or nothing" proposition, and thus cannot be implicit as to some parties, such as the adopting municipalities, without loosing its effectiveness altogether, even unto strangers like Veeck.  Except for his bald assertion, however, Veeck presents no viable support for his waiver proposition.  Moreover, when properly analyzed, his argument is nothing more than a thinly disguised

---

[64]  See, e.g., Sherrod v. American Airlines, 132 F.3d 1112, 1119 n.5 (5th Cir. 1998).

[65]  See, e.g., Norma Ribbon & Trimming, Inc. v. Little, 51 F.3d 45, 48 (5th Cir. 1995) ("Therefore, even if it be assumed that the ribbon flowers were copyrightable, the Littles through inadequate notice have made them part of the public domain, and Norma Ribbon was free to copy them.").

reformulation of his due process/public domain argument — namely, that the mere fact of adoption automatically and totally vitiated SBCCI's copyright and superceded SBCCI's contractual protection as against all comers.

As fully explicated above, my analysis reaches the conclusion that, as a matter of law, SBCCI's codes are not in the public domain and that they retain their copyright protection against Veeck and others thus situated. I observe that the district court also concluded that the fact that SBCCI had given the North Carolina Building Inspectors Association permission to publish on the Internet that state's building codes, which are modeled on the SBCCI codes, does not constitute universal waiver. As the district court noted, "[c]ountless entities provide free access to materials on the Internet and still retain enforcement of their copyrights."

   d.  <u>Fair Use</u>

Finally, Veeck argues that his posting of SBCCI's copyrighted material on the Internet constituted a "fair use." Congress has excepted from infringement of copyrighted materials such specified uses as news reporting, teaching, and research.[66] Courts are instructed to consider four factors when deciding whether a particular use of copyrighted material is a "fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;

---

[66] <u>See</u> 17 U.S.C. § 107 (2000).

70

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.[67]

When, as with Veeck's infringing activity here, the use of a copyrighted work is noncommercial, the ability to defeat an infringer's affirmative defense of fair use requires "proof either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work."[68]

The key question under the "purpose and character" prong is whether the alleged infringer's product "merely supersedes the objects of the original creation or instead adds something new with a further purpose or different character, altering the first with new expression, meaning, or message. In other words, it asks whether and to what extent the new work is 'transformative.'"[69] Veeck's posting of the codes on his website was not of a commercial nature or for nonprofit educational purposes. Neither did his actions in this case have any _transformative_ effect on the original work.[70] In fact, there is neither an apparent nor announced purpose

---

[67] _Id._; _see also_ _Campbell v. Acuff-Rose Music, Inc._, 510 U.S. 569, 577 (1994).

[68] _Sony Corp. v. Universal City Studios_, 464 U.S. 417, 451 (1984).

[69] _Campbell v. Acuff-Rose Music Inc._, 510 U.S. at 579 (citations omitted) (internal quotations omitted).

[70] In _Campbell v. Acuff-Rose Music_, while evaluating a fair use defense, the Supreme Court discussed the degree to which a

behind Veeck's wholesale copying except that he chose to do so and believes, empirically, that he has the unfettered right to do so. He presents no affidavits or other summary judgment evidence to suggest that the townsfolk of Anna and Savoy or contractors, builders, or other interested parties, would not have access to the codes without Veeck's intervention.

The nature of the copyrighted work constitutes the second prong of the fair use analysis. The work at issue is an original technical code produced by a non-profit organization to encourage uniformity, safety, and economy in a technical area for the benefit of an increasingly complex society. Within the four-pronged jurisprudential test for fair use, Veeck's position finds its only viable support in this one factor. Although the code is an original work requiring creativity on the part of SBCCI, it is also an informational and functional work. This fact broadens the scope of the fair use defense.[71] In addition, the copyrighted work in this case is part of the regulatory codes of Anna and Savoy. Although this factor lends a modicum of support to Veeck's position, it (1) must be considered in light of all the other

_____

parodist's work transforms a copyrighted original. See 510 U.S. at 579. There, the parodist was the one making the transformation. In contrast, Veeck admits that he did nothing more than copy SBCCI's model codes verbatim; he did not transform them, through parody or otherwise. Therefore, Veeck's argument that the adoption by reference of SBCCI's codes by Anna and Savoy were "transformative" events does not find a home in Campbell.

[71] 4 Nimmer on Copyright § 13.05[A][2][a] (citing Diamond v. Am-Law Corp., 745 F.2d 142 (2d Cir. 1984)).

factors, and (2) is not as significant as the others in the fair use determination.[72]

The third fair use factor — amount and substantiality of portion used vis-à-vis copyrighted work as a whole — weighs heavily against Veeck. He published verbatim the entire set of codes obtained from SBCCI. Even though total copying does not automatically defeat a fair use defense, and partial copying does not automatically validate it, the general rule is that reproduction of an entire work constitutes an <u>un</u>fair use.[73] Moreover, the codes copied here were not, literally speaking, "the" codes of Anna and Savoy: Even though the towns' ordinances adopted the model codes that Veeck copied, the enacting ordinances also contained modifications and clarifications not found in the verbatim versions of the SBCCI codes posted by Veeck.

Fourth, Veeck's use could have a substantially detrimental effect on the market for the copyrighted work. In considering this factor, we must assess the consequences of wide-spread conduct similar to Veeck's, not just his alone.[74] There is no genuine

---

[72] Id. (citing Campbell v. Acuff-Rose Music Inc., 510 U.S. at 586; Robinson v. Random House, Inc., 877 F.Supp. 830, 841 (S.D.N.Y. 1995)).

[73] Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 109 (2d Cir. 1998).

[74] Campbell v. Acuff-Rose Music Inc., 510 U.S. at 590 (consideration of the fourth factor "requires the court to consider not only the extent of the market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and wide-spread conduct of the sort engaged in by the defendant ...

dispute, based on the summary judgment record, "that some meaningful likelihood of future harm exists."[75] Veeck's posting of the codes on the Internet could prove harmful by depressing the price and reducing SBCCI's market, thus depriving it of income used in its socially valuable efforts of confecting, promulgating, and revising model codes. Veeck's non-commercial, free publication of the codes exacerbates the detrimental effect on the potential market: By furnishing the codes entirely free of charge, he could effectively destroy the market rather than simply creating competition and price suppression. When viewed in this light, the free promulgation of a work is seen to be potentially more financially deleterious than is commercial piracy or cut-rate competitive availability. Currently, the sale of the copyrighted codes to builders, contractors, design professionals, and other interested parties (1) accounts for one-third of SBCCI's income, (2) provides incentive for SBCCI to stay in business so that small governmental subdivisions, like the ones at issue in this case, can obtain the benefits of a pre-crafted technical code, (3) fosters uniformity, and (4) provides some measure of independence to SBCCI from its members by holding down the extent of SBCCI's reliance on membership dues and assessments.

---

would result in a substantially adverse impact on the potential market' for the original.") (quoting 4 Nimmer on Copyright § 13.05[A][4]).

[75] Sony Corp., 464 U.S. at 451 (emphasis added).

The situation presented in this case is not one of mere copying of the codes for personal use, or of Veeck's asking SBCCI for permission to post the codes on the web and having permission denied. As Veeck copied SBCCI's model code verbatim, the fair-use calculus weighs heavily against him. Veeck's total copying and promulgation of SBCCI's model code, and the potentially harmful effect of such copying on the market, render his use <u>unfair</u>.

C.  <u>SBCCI's Infringement Counterclaim</u>

SBCCI holds valid copyrights in its codes, and Veeck has expressly admitted copying them. In the absence of a viable defense, the district court was correct in holding that SBCCI established copyright infringement. Under these circumstances, I am satisfied that the district court's conclusions and its award of an injunction and the minimum statutory damages on each of the five counts of copyright infringement are free of error.[76] Likewise, I find no abuse of discretion in the district court's award of attorneys' fees.[77]

---

[76]  At the pertinent time, 17 U.S.C.A. § 504(c)(1) set the range of statutory damages for each act of copyright infringement at no less than $500 or more than $20,000. A 1999 amendment has raised those amounts to $750 and $30,000, respectively. <u>Id.</u>; Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, § 2(1), 113 Stat. 1774 (1999).

[77]  <u>Hogan Systems, Inc. v. Cybresource Int'l, Inc.</u>, 158 F.3d 319, 325 (5th Cir. 1998) (applying abuse of discretion standard of review to award of attorneys' fees in copyright case). Veeck did not brief the questions of the district court's grant of a permanent injunction or award of damages and attorneys' fees, and therefore waived them.

### III. CONCLUSION

Two decades ago, in <u>BOCA</u>,[78] the First Circuit wrestled with the serious issues raised by what was then only a "possible trend" toward local, state, and federal adoption of model codes.[79]  That court wisely left open for future evaluation the modern realities surrounding technical regulatory codes and standards.  As the <u>BOCA</u> court wrote, groups that develop such works "serve an important public function; arguably they do a better job than could the state alone in seeing that complex yet essential regulations are drafted, kept up to date and made available."[80]  In like manner, the two federal circuits that subsequently addressed challenges similar to that considered by the First Circuit in <u>BOCA</u> have declined to invalidate copyrights in works incorporated by reference into the law.[81]  In the legislative arena, Congress has decreed the policy that federal agencies adopt privately authored technical standards without voiding the protection afforded to the authors by copyright; and the OMB has directed all federal agencies adopting such standards to respect the copyright protections of the copyright holders — the diametric opposite of causing copyright protection to vanish when the work is adopted as law.

---

[78]  628 F.3d 730.

[79]  <u>Id.</u> at 736.

[80]  <u>Id.</u>

[81]  <u>See</u> <u>Practice Management</u>, 628 F.3d 730; <u>CCC</u>, 44 F.3d 61.

I emphasize that my analysis is restricted to the narrow set of facts and circumstances before us. At bottom, I think it improvident for this court to legislate judicially an absolute, per se rule that referential enactment of a copyrighted work like a technical code into law mystically metamorphoses it into an "idea," puts it into the public domain, waives its copyright protection universally, and otherwise strips it of copyright protection vel non. Under the instant circumstances, no one is being denied reasonable access to the SBCCI codes that have been adopted in globo by local governments; neither does Veeck's specific actions, however altruistic they might have been, make a viable case for fair use. Nevertheless, I readily concede, that even slightly different facts under but slightly different circumstances could convince me to support a different result, albeit not a per se rule.

Today, the trend toward adoption of privately promulgated codes is widespread and growing, and the social benefit from this trend cannot be seriously questioned. The necessary balancing of the countervailing policy concerns presented by this case should have led us to hold that, on these facts, the copyright protection of SBCCI's privately authored model codes did not simply evanesce ipso facto, when the codes were adopted by local governments; rather, they remain enforceable, even as to non-commercial copying, as long as the citizenry has reasonable access to such publications cum law —— and subject, of course, to exceptions for implied or

express waiver or consent, fair use, or other recognized exceptions, when applicable. For these reasons, I cannot join in the majority's inflexible reasoning and unnecessarily overbroad holding. I therefore respectfully dissent.